930 P.2d 1315

**STATE of Arizona, Appellee,**

v.

**Freddie Michael SOLANO, Appellant.**

**No. 1 CA–CR 95–0371.**

Court of Appeals of Arizona, Division 1, Department B.

Dec. 10, 1996.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Division, and J. Randall Jue, Assistant Attorney General, Phoenix, for Appellee.

Dean M. Trebesch, Maricopa County Public Defender by Paul J. Prato, Deputy Public Defender, Phoenix, for Appellant.

## OPINION

GERBER, Judge.

Freddie Michael Solano (Solano) appeals his convictions and sentences for first-degree murder, a class 1 felony, and two counts of aggravated assault, class 3 dangerous felonies. We hold that the trial court erred in denying Solano's motion to suppress his statement to police officers because the officers' transportation of him to the crime scene converted a lawful investigative detention into a *de facto* arrest. However, because we find that error harmless, and no other error exists, we affirm his convictions and sentences.

## FACTUAL AND PROCEDURAL BACKGROUND

We recite these facts based on the state's evidence at trial. On Christmas night 1993, Jennifer Guzman (Guzman) was driving her mother's car in South Phoenix with her friends U.M. and N.M. when a car driven by Solano pinned her car against a curb. Solano pointed a gun at Guzman and her friends and said, several times, "Give me your fucking car." According to occupants of Solano's car, Solano wanted to steal Guzman's car, which he thought belonged to a rival gang member, so that he could obtain its customized spoke rims.

Instead of stopping her car, Guzman drove away. Solano pursued her. The high speed chase ended when Guzman lost control and

crashed. Solano pulled up, aimed his pistol at Guzman's car, and fired. The bullet struck Guzman in the head. She later died from the wound.

Solano was questioned several hours after the shooting but denied any involvement. He was arrested the following day. He then admitted to a detective that he fired into Guzman's car. He told the detective that he threatened to steal the wheel rims from the car in order to scare its occupants, but he denied that he actually intended to do so.

Solano testified at trial. He denied that he intended to steal Guzman's vehicle. He claimed that he and his companions merely wanted to scare the occupants of the Guzman vehicle because the Solano group believed the Guzman group to be rival gang members. Solano claimed that the fatal shot discharged when one of his passengers pulled on his arm.

The jury found Solano guilty of first-degree murder and two counts of aggravated assault. The trial judge sentenced him to life imprisonment for the first-degree murder charge and to concurrent maximum prison terms of 15 years for each count of aggravated assault. He filed a timely notice of appeal raising the following issues:

1. Whether the court erred in denying his motion to suppress the statement he made the night of the shooting;

2. Whether the trial court erred in instructing the jury pursuant to *State v. Wussler,* 139 Ariz. 428, 679 P.2d 74 (1984);

3. Whether the trial court erred in failing to instruct the jury regarding the necessity for unanimity on the aggravated assault charges; and

4. Whether the trial court erred in allowing the jury to be instructed prior to closing argument.

## DISCUSSION

## I. DENIAL OF MOTION TO SUPPRESS

Shortly after Guzman was shot, Phoenix police officer Fred B. Santos (Santos) arrived at the shooting scene where he encountered U.M., who was extremely agitated. U.M. gave Santos a description of the man who shot at Guzman's car.

After speaking to U.M., Santos returned to patrol. Approximately two hours later, at 1:30 a.m., he received a radio call to investigate a roadside altercation between a man and two women. When Santos arrived at the scene, he separated the man, Solano, from the two women by handcuffing him and placing him in his patrol car. Santos obtained biographical information from Solano and read him *Miranda* warnings.

After Solano and the two women were interviewed, officers concluded that there was no basis to arrest them for the altercation. However, Santos and his sergeant, who was also present, realized that Solano's vehicle resembled the one involved in Guzman's shooting. Santos also realized that Solano generally matched U.M.'s description of the shooting suspect. The officers decided to transport Solano to the scene of the shooting, about one-half mile away, where officers were still investigating the shooting. After they arrived shortly after 2:00 a.m., Santos asked a detective if he wanted to talk to Solano. At the detective's direction, Santos returned to the patrol car and asked Solano if he was involved in the shooting. According to Santos, Solano laughed and replied: "Why would I waste my time with shit like this? I've got better things to do."

Solano remained handcuffed in Santos' police car for 20 to 30 minutes until the detective interviewed him. Several minutes into that interview, the detective had Santos remove the handcuffs from Solano, who exited the car and continued talking to the detective. According to Santos, Solano's entire conversation with the detective lasted approximately 15 minutes. Santos returned Solano to his car at about 3:30 or 3:45 a.m., approximately two hours after police had first contacted him.

Prior to trial, Solano moved to suppress his statement to Santos as the product of an arrest lacking probable cause. The trial court denied the motion, finding "under the totality of the circumstances, . . . the officers acted reasonably and diligently in investigating the Defendant's suspected involvement" in both of the incidents under investigation.

Solano challenges this determination on appeal. We give great deference to the trial court's factual determination, but we review *de novo* the ultimate question whether an illegal arrest occurred. *State v. Blackmore*, 186 Ariz. 630, 632, 925 P.2d 1347, 1349 (1996).

### 1. *Duration of detention.*

Under *Terry v. Ohio*, 392 U.S. 1, 24, 88 S.Ct. 1868, 1881–82, 20 L.Ed.2d 889 (1968), a police officer may make a limited investigatory stop if the officer has reasonable suspicion that the suspect is involved in criminal activity. Solano does not challenge the existence of reasonable suspicion to detain him to investigate the altercation with the two women or, later, to investigate his involvement in the Guzman shooting. Instead he argues that this initially valid detention developed into a *de facto* arrest without probable cause.

Factors in determining whether a detention exceeds the permissible scope of a *Terry* stop include the proximity between the location of the crime and the scene of the stop; the amount of time between the crime and the stop; and the duration of the stop. *Blackmore*, 186 Ariz. at 633, 925 P.2d at 1350. Solano argues that under *Terry* the overall length of the detention was "constitutionally untenable".

There is no rigid time limitation on *Terry* stops. *United States v. Sharpe*, 470 U.S. 675, 685–6, 105 S.Ct. 1568, 1574–76, 84 L.Ed.2d 605 (1985). An investigative detention must last no longer than necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983). Solano's statement was inadmissible if it constituted the fruit of an illegal *de facto* arrest. *See State v. Reffitt*, 145 Ariz. 452, 457, 702 P.2d 681, 686 (1985). The overall length of Solano's detention is a matter of grave concern. Even if the period of detention for investigation of the altercation with the two women is excluded, Solano was detained for a substantial period of time.

Solano's detention for the investigation of the Guzman shooting began immediately after officers found no basis to arrest him for the altercation with the two women. He remained at the scene of his initial detention only briefly after that determination was made, given Santos' testimony that he drove Solano to the scene of the shooting shortly after 2:00 a.m. Although the record is unclear, Santos apparently questioned Solano within minutes of his arrival at the shooting scene. Solano made the statement to Santos in response to this initial questioning. The period of detention from the time he was first contacted by police until his statement approximated forty-five minutes. While this time period by itself was not so long as to create a *de facto* arrest, it is sufficient to support that conclusion in conjunction with other factors.

### 2. *Transportation of defendant to crime scene.*

Standing alone, the transportation of Solano to the crime scene for interrogation transformed the initial detention into an arrest without probable cause. "[P]olice do not have unlimited power to move a suspect subjected to a *Terry*-type stop." 4 Wayne LaFave, Search and Seizure, § 9.2(g) at 76 (3d ed.1996). Briefly transporting a detainee a short distance is reasonable for an on-scene identification by a witness. *See e.g., United States v. Lewis*, 486 A.2d 729, 734 (D.C.1985); *Commonwealth v. Williams*, 422 Mass. 111, 661 N.E.2d 617, 623 (1996). *See also* La Fave, *id.* at 78–79, n. 222 (collecting cases). However, the transportation of Solano to the scene of the Guzman shooting had no such purpose. Santos even admitted he had no reason to believe that witnesses would be present at the scene of the shooting and he conceded that Solano was transported to the scene merely to allow him to be questioned by detectives.

This movement of the suspect exceeded the parameters of a *Terry* stop. In *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), a plurality of the United States Supreme Court disapproved a shorter movement of a suspect from an airport concourse to a security office as an unnecessarily intrusive extension of a *Terry* stop. The court stated:

[T]here are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention ... There is no indication in this case that such reasons prompted the officers to transfer the site of the encounter from the concourse to the interrogation room. It appears, rather, that the primary interest of the officers was not in having an extended conversation with Royer but in the contents of his luggage, a matter which the officers did not pursue orally with Royer until after the encounter was relocated to the police room. The record does not reflect any facts which would support a finding that the legitimate law enforcement purposes which justified the detention in the first instance were furthered by removing Royer to the police room prior to the officers' attempt to gain his consent to a search of his luggage.

*Id.,* 460 U.S. at 504–05, 103 S.Ct. at 1328 (plurality opinion).

Arizona cases have addressed extending a *Terry* stop by physical movement of the suspect. In *State v. Winegar,* 147 Ariz. 440, 711 P.2d 579 (1985), our supreme court considered whether the trial court erred in failing to suppress statements made by a defendant stopped by police on a street in Hagerman, Idaho. The defendant argued that the stop became a *de facto* arrest after police moved her to the nearby city hall. The court agreed and stated:

First, we cannot accept the argument that the movement to City Hall was merely the continuation of a valid *Terry* stop. A full *Terry* stop could have been performed on the street in Hagerman. We see no reason why, if a police officer reasonably suspects that there may be a concealed weapon, he cannot perform a weapons frisk of a woman on the spot. .... After the pat-down was completed, the detectives could have briefly questioned defendant regarding the Hill murder. Nothing in the record indicates why the Hagerman street was not suitable for these purposes.

*Terry* stops are tolerated as an exception to the probable cause requirement of the Fourth Amendment because they are brief and as narrowly circumscribed as possible. *See Dunaway v. New York, supra,* 442 U.S. at 212, 99 S.Ct. at 2256. After briefly searching and questioning the defendant on the street, the police either should have arrested her if probable cause had arisen, or, since none did, should have released her.

147 Ariz. at 446–47, 711 P.2d at 585–86.

The record is silent regarding any legitimate law enforcement purposes furthered by moving Solano to the shooting scene. No testimony at the suppression hearing indicated that the police at the scene of the shooting had access to specific information enabling them to arrest or clear Solano. Santos certainly could have asked Solano about the shooting at the time and location of the initial stop.

More fundamentally, moving a person detained in a *Terry* stop to another location for questioning comes perilously close to transporting him to a police station for that purpose. In considering what separates a permissible *Terry* stop from an illegal arrest, the United States Supreme Court has stated:

[O]ur view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or some other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.

*Hayes v. Florida,* 470 U.S. 811, 816, 105 S.Ct. 1643, 1647, 84 L.Ed.2d 705 (1985); *accord, Dunaway v. New York,* 442 U.S. 200, 212, 99 S.Ct. 2248, 2256–57, 60 L.Ed.2d 824 (1979).

The state fails to persuade us that Solano's detention was not a *de facto* arrest. Three of the cases it cites involve challenges to the length of the detention, a factor we do not find dispositive. *See United States v. Sterling,* 909 F.2d 1078, 1085 (7th Cir.1990);

**518**

*United States v. Davies,* 768 F.2d 893, 901–02 (7th Cir.), *cert. denied sub nom. Kaprelian v. United States,* 474 U.S. 1008, 106 S.Ct. 533, 88 L.Ed.2d 464 (1985); *Mondello,* 927 F.2d at 1471. A fourth case, *United States v. Tehrani,* 49 F.3d 54, 61 (2nd Cir.1995), analyzed the length of detention but also considered the defendant's claim that he was arrested when he was moved from the airport concourse to an office. However, the movement of the suspect in *Tehrani* was shorter and did not involve handcuffs. These factors distinguish that restraint from the one in this case.

The final case cited by the state, *United States v. Pollack,* 895 F.2d 686, 692–93 (10th Cir.), *cert. denied,* 498 U.S. 985, 111 S.Ct. 520, 112 L.Ed.2d 532 (1990), involved the movement of defendant and his car two miles prior to the search of the vehicle's trunk. The Tenth Circuit found that movement justified because probable cause to arrest already existed. *Pollack* took care to distinguish the detention from the one in *United States v. Recalde,* 761 F.2d 1448, 1456 (10th Cir.1985), *overruled in other part, United States v. Price,* 925 F.2d 1268 (10th Cir.1991), in which the transportation of defendant five miles from a traffic stop to the closest police station was held to be a *de facto* arrest. *See also United States v. Obasa,* 15 F.3d 603, 608 (6th Cir.1994) (finding that *Terry* stop had been transformed into unlawful arrest because officer transported defendant to airport police station rather than continuing investigation at the point of detention).

*3. Did the unlawful arrest taint the subsequent statement?*  ⁍

■ A confession obtained after an illegal arrest may be admissible even if it would not have come to light but for the illegal police conduct. *Reffitt,* 145 Ariz. at 457, 702 P.2d at 686. The controlling inquiry is whether the accused's confession resulted from exploitation of the illegal arrest. Three factors [1] bear upon this question:

1. the time elapsing between the illegality and the acquisition of the evidence;

2. the presence of intervening circumstances; and

3. the purpose and flagrancy of the original official misconduct.

*Brown v. Illinois,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62; *State v. Monge,* 173 Ariz. 279, 281, 842 P.2d 1292, 1294 (1992).

■ We consider the last element first. During the suppression hearing, neither party probed the issue of the "flagrancy" of police "misconduct" in effecting the unlawful arrest. As a result, the record contains no suggestion that officers were aware they made an illegal arrest, let alone that they ignored that fact in attempting to extract Solano's confession. *See Reffitt,* 145 Ariz. at 460, 702 P.2d at 689 (police "mistake" in failing to secure arrest warrant, though "erroneous and regrettable," did not amount to "flagrant" or "purposeful" misconduct). However, "it does not follow from this that an otherwise inadmissible confession deserves to be admitted into evidence simply because there has been no showing of a flagrant and purposeful Fourth Amendment violation." 5 LaFave, *id.,* § 11.4(b) at 263. To give this factor dispositive weight would elevate it to the level of a good faith exception to the exclusionary rule, a status that the Supreme Court has rejected. *Id.; Taylor v. Alabama,* 457 U.S. 687, 693, 102 S.Ct. 2664, 2668–69, 73 L.Ed.2d 314 (1982).

The first two factors of the *Brown* analysis support the suppression of Solano's statement. The statement was elicited only minutes after his transportation to the scene of the shooting converted his detention into an illegal arrest. The record reveals no intervening circumstances that purge the taint of the illegal arrest. *See Monge,* 173 Ariz. at 281, 842 P.2d at 1294. We therefore conclude that the trial court erred in failing to suppress Solano's statement to Santos.

---

**1.** Some cases mention a fourth factor: the voluntariness of the confession. *See Blackmore,* 186 Ariz. at 634, 925 P.2d at 1351 (dictum); *Reffitt,* 145 Ariz. at 458, 702 P.2d at 687. However, this factor is more properly analyzed as a threshold requirement for admissibility because an involuntary confession must necessarily be suppressed. *Reffitt,* 145 Ariz. at 458, 702 P.2d at 687. Solano does not challenge the voluntariness of his statement to Santos.

### 4. *Harmless error analysis.*

■ The constitutional error in admitting Solano's statement may nevertheless be harmless. *Chambers v. Maroney,* 399 U.S. 42, 52–53, 90 S.Ct. 1975, 1981–82, 26 L.Ed.2d 419 (1970). "Error, be it constitutional or otherwise, is harmless if we can say, beyond a reasonable doubt, that the error did not contribute to or affect the verdict." *State v. Bible,* 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993), *cert. denied,* 511 U.S. 1046, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994).

■ On its face, Solano's statement to Santos was exculpatory. However, in the context of the defense presented, the statement had a damaging aspect. Because Solano initially denied involvement in the shooting and made no mention of an accidental discharge of his weapon, the statement tended to discredit his trial testimony as an after-the-fact concoction.

■ An improperly admitted defense statement may be rendered harmless by the proper admission of another statement bearing on the same issue. *See State v. Montes,* 136 Ariz. 491, 497, 667 P.2d 191, 197 (1983)(defendant's statement, admitted in violation of *Miranda,* was rendered "innocuous" by properly admitted statement). The state introduced a taped statement made by Solano to detective Robert Mills (Mills) approximately 24 hours after the shooting. In that statement, Solano admitted involvement in the shooting. When asked why he fired into the victims' car, he responded: "I don't know. I just, I just did. Because, it was cuz [sic] Robert [his companion] said they were messing with him." This statement to Mills made no mention that the weapon accidentally discharged.

We conclude beyond a reasonable doubt that the admission of Solano's statement to Santos did not contribute to the jury's verdict. Solano's subsequent statements to Mills which were properly admitted into evidence and which failed to mention any accidental discharge nullified any harm caused by admission of the statement to Santos.

## II. *WUSSLER INSTRUCTION*

■ Solano next argues that he was deprived of due process because the trial court instructed the jury, in accordance with *State v. Wussler,* 139 Ariz. 428, 679 P.2d 74 (1984), that it must unanimously acquit him of greater offenses before deliberating on lesser-included offenses. Although our supreme court recently overruled *Wussler* and announced a new instruction to guide deliberations, it also held that the former instruction does not violate the state or federal constitutions or rise to the level of fundamental error. *State v. LeBlanc,* 186 Ariz. 437, 440, 924 P.2d 441, 444 (1996).

## III. *FAILURE TO INSTRUCT JURY ON UNANIMITY*

■ Prior to trial, Solano moved to dismiss the charges of aggravated assault of U.M. and N.M. on the ground they were duplicitous. He argued that the grand jury transcript disclosed two separate acts of aggravated assault against each victim, one before and the other after the high-speed chase. Solano contended that this evidence presented the risk of a non-unanimous jury verdict because it would be impossible to tell whether the jurors unanimously agreed that he committed an aggravated assault as to each victim prior to or after the chase. Judge O'Toole denied the motion to dismiss, stating

The jury will be instructed that the State is alleging that the Defendant's pursuit of the girls, during which he is alleged to have pointed and then fired a gun at them, is a single act of assault as to each girl. In addition, they will be instructed that, in order to find the Defendant guilty of aggravated assault as alleged in the two counts, the State must also prove that the Defendant used a handgun to intentionally place each girl in a reasonable apprehension of immediate physical injury. In doing so, the jury will be instructed that they must unanimously agree on the specific act of gun related assaultive conduct as to each alleged victim before they can find the Defendant guilty of a single aggravated assault as alleged.

During trial, Solano's counsel asked Judge Gerst, the trial judge, for clarification of this pre-trial ruling. Judge Gerst stated that he would give a standard instruction defining aggravated assault. Judge Gerst stated: "Apparently, Judge O'Toole felt that the brief period of time and travel that existed in this case was sufficient for there to be a continuous act." Without further comment from Solano, Judge Gerst gave the jurors an instruction on aggravated assault without specific reference to a requirement of unanimity on those charges. Solano contends that Judge Gerst erred in not instructing the jury that it had to agree unanimously on the gun related conduct as to each victim before it could find him guilty of a single count of aggravated assault.

■ We find no error. This case does not implicate the rule that "where more than one offense than that charged ... is admitted in evidence the trial court has the duty to require the State to elect upon which of the offenses it relies for conviction." *State v. Counterman*, 8 Ariz.App. 526, 531, 448 P.2d 96, 101 (1968). Requiring such an election safeguards a defendant's right to a unanimous jury verdict with respect to the criminal act for which he was tried. *Id.* However, this rule does not apply " 'where a series of acts form part of one and the same transaction, and as a whole constitute but one and the same offense.' " *Id.*, (quoting *People v. Jefferson*, 123 Cal.App.2d 219, 266 P.2d 564 (1954)). In *Counterman*, this court held that evidence of two shootings by the defendant at the same victim constituted a single incident and did not require the state to elect which assault the defendant committed. *Id.* Solano's separate encounters with U.M. and N.M. before and after the chase, like the separate shootings in *Counterman*, constituted single assaults against each victim. Although Solano did not seek to force a prosecutorial election but rather a curative jury instruction on unanimity, the same analysis applies. We conclude that Judge Gerst did not err in his instructions to the jury.

## IV. *TIMING OF JURY INSTRUCTIONS*

■ Solano next argues that the trial court erred in instructing the jury before counsel gave closing arguments. The applicable version of Rule 19.1(a), Arizona Rules of Criminal Procedure, specifies that the court's instructions are to follow closing arguments but also provides that "with the permission of court, the parties may agree to any other method of proceeding." Counsel both agreed that closing arguments would follow the instructions. Solano argues that agreement was nullified when the court denied his counsel's subsequent request that the court repeat the reasonable doubt instruction after closing arguments. However, defense counsel raised no such claim in the trial court. Consequently, the parties' agreement regarding the order of proceedings was unaffected. We conclude that the court did not err in instructing the jury before argument.

■ Solano also claims that the court erred in denying his request that the reasonable doubt instruction be repeated after the arguments. There is no merit to this claim. In *State v. Johnson*, 173 Ariz. 274, 842 P.2d 1287 (1992), our supreme court stated that, even if the jury were instructed on reasonable doubt at the beginning of the case, that instruction must be repeated "following the evidence and before the commencement of deliberations." 173 Ariz. at 276, 842 P.2d at 1289. The instructions in this case met this requirement.

## CONCLUSION

We have not reviewed the entire record for fundamental error because such review is no longer required. *State v. Smith*, 184 Ariz. 456, 459, 910 P.2d 1, 4 (1996). Solano's convictions and sentences are affirmed.

PATTERSON, P.J., and LANKFORD, J., concur.