34 P.3d 971

The STATE of Arizona, Appellee,

v.

Victor NAVARRO, Appellant.

No. 2 CA–CR 00–0294.

Court of Appeals of Arizona,
Division 2, Department A.

Nov. 13, 2001.

Janet Napolitano, Arizona Attorney General By Randall M. Howe and Cynthia A. Ryan, Tucson, for appellee.

Law Offices of Thomas Jacobs By Thomas Jacobs, Tucson, for appellant.

## OPINION

PELANDER, J.

¶ 1 After a jury trial, appellant Victor Navarro was convicted of attempted second-degree murder, as a lesser-included offense of attempted first-degree murder, and two counts of aggravated assault. The trial court sentenced him to concurrent, presumptive prison terms, the longest of which was 10.5 years for the attempted murder conviction.

¶ 2 Navarro raises two issues on appeal: (1) whether the trial court erroneously denied his pretrial motion to suppress police photographs taken of him and all evidence derived therefrom, including subsequent out-of-court and in-court identifications, and (2) whether A.R.S. § 13–604(I) is unconstitutional as applied to him because its sentencing range fails to differentiate between defendants convicted of attempted second-degree murder and those convicted of attempted first-degree murder. We affirm.

## I. Motion to Suppress

¶ 3 The only pertinent facts are those relating to the suppression issue. "In reviewing the denial of a motion to suppress evidence, we view the facts in the light most favorable to upholding the trial court's ruling ... [and consider] only the evidence presented at the suppression hearing." *State v. Wyman,* 197 Ariz. 10, ¶ 2, 3 P.3d 392, ¶ 2 (App.2000) (citation omitted). In the early morning hours of July 11, 1999, Tucson Police Department Detective Joseph Godoy investigated a shooting that had occurred outside a residence during a party. Godoy and all other responding officers went to the scene in unmarked police cars and were dressed in street clothes. The victim had

been shot six times. Godoy learned during the investigation that witnesses had described the shooter as a "thin, Hispanic male with a red shirt and some Levis."

¶ 4 Several hours into the investigation, at approximately 5:20 a.m., a white Camaro pulled up behind Godoy's unmarked car, which was parked near the residence. At that time, Godoy was inside his vehicle interviewing a witness. Godoy saw two other detectives walking quickly toward the Camaro. After escorting the witness away from his car and returning moments later, Godoy saw three individuals in handcuffs, including Navarro, standing by the Camaro. Godoy also noticed a large quantity of beer in that car. The detective who had made initial contact with the occupants of the Camaro told Godoy that Navarro, who had been a passenger in the Camaro, fit the description of the shooter. Sergeant Rodriguez directed Godoy to take Navarro to the police station to interview him about the shooting. Rodriguez wanted the interview conducted away from the scene because he was concerned about prior interruptions in the investigation there.[1]

¶ 5 Godoy walked Navarro from the back of Godoy's unmarked car to the passenger side. Godoy identified himself, told Navarro there had been a shooting, and stated that he wanted to talk with Navarro about it. Godoy asked Navarro if it was "okay if we go to the police station, get away from the crowd," and Navarro said it was. Godoy did not tell Navarro that he was under arrest or that he had to go with him, nor did Navarro tell Godoy that he did not want to go with him. At some point after Godoy's initial contact with Navarro and before Navarro seated himself in Godoy's vehicle, Godoy removed Navarro's handcuffs. Godoy could not definitively recall, however, whether he had removed the handcuffs before, during, or after Navarro had agreed to accompany him downtown. Godoy quickly did a visual search of Navarro for weapons but did not pat him down. Godoy had Navarro sit in the front seat of his car and asked him to use the seat

belt. Godoy then drove with Navarro to the station.

¶ 6 Upon their arrival there, Navarro remained unhandcuffed as he accompanied Godoy to a third-floor interview room. Navarro was unattended while he used a restroom at the station and was left alone in the interview room while Godoy made a telephone call and bought Navarro a soft drink. Godoy testified that Navarro never asked to leave at any point and was very friendly throughout their interaction.

¶ 7 Godoy tape-recorded his interview with Navarro, and a transcript of the interview was admitted as an exhibit at the suppression hearing. The interview began with Godoy recapping their off-tape conversation in which Godoy had told Navarro what the police knew about the shooting and that Navarro fit the description of the shooter. Before Godoy began asking Navarro questions about the shooting and his possible involvement in it, Godoy read Navarro his *Miranda*[2] rights, stating, "because the cop put you in handcuffs, he put you under arrest for minor, and [sic] possession or, or whatever, I need to advise you of your rights."[3] Godoy testified that, at the time of the interview, he had not known, but had believed, that Navarro possibly had been handcuffed either because he had been arrested for being a minor in possession of alcohol or simply for officer safety reasons. As Godoy later learned, Navarro was never cited for possessing alcohol.

¶ 8 Toward the end of the interview, Godoy asked Navarro if he was willing to be fingerprinted and photographed for identification purposes. Godoy testified that he had wanted to obtain Navarro's photograph and fingerprints because Navarro had said he had never been arrested before. Godoy also wanted photographs of Navarro in the clothes he was wearing at the time, which presumably were the same clothes he had been wearing at the party earlier that morning. Godoy told Navarro that he wanted to show photographs of him to people who had

---

1. Godoy had previously interviewed two other witnesses away from the scene, at the witnesses' request. George Molina, the driver of the Camaro, was also taken to the police station for an interview by another detective.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. Navarro was seventeen, almost eighteen, years old at the time of the offense.

been at the party to see if they could identify him. Navarro agreed to have his photograph and fingerprints taken and signed two consent forms that stated, "I hereby authorize the Tucson Police Department to take my photograph, fingerprints and palmprints for the purposes of identification only."

¶ 9 The police took three photographs of Navarro: a single, "mug shot" photograph, with Navarro's clothing draped, for use in a photographic lineup, and two photographs of Navarro in his street clothes. After Navarro had been fingerprinted and photographed, another officer took him to an apartment because Navarro claimed to have been there earlier that morning and wanted the police to accompany him to verify that fact. Godoy later showed the photographic lineup to eyewitnesses of the shooting who identified Navarro as the shooter.

¶ 10 Godoy admitted that, if Navarro had refused to accompany him downtown to the police station, he had not had probable cause to arrest him and could not have forced him to go. Godoy further admitted that he could have interviewed Navarro at the scene but preferred to move him elsewhere for questioning because of past experience with witnesses. Navarro did not testify at the suppression hearing.

¶ 11 At the conclusion of the hearing, the trial court ruled:

I find that the Defendant was just momentarily detained at the scene of the investigation and that Detective Godoy was not the detective that originally placed the handcuffs on the Defendant, that Detective Godoy did take the handcuffs off of the Defendant and asked the Defendant whether he would accompany Detective Godoy to the police station for an interview.

The Defendant agreed to the detective's request. He sat in the front seat of an unmarked police vehicle, accompanied the detective to an interview room. He was informed that he was either a witness or possibly a suspect. He was advised of his Miranda rights.

He agreed to answer the questions that Detective Godoy asked concerning the homicide investigation. Detective Godoy

never told him that he could not leave. Apparently, he never asked to leave.

Under all of those circumstances, the Court finds that he was not in custody or under arrest, that he voluntarily consented to participating in the investigation. The court finds that the consent to give the fingerprints and photos was not limited to identification for—well, it was not limited, period. It was for any identification purposes that the police would choose to use the items for. For those reasons, the motion to suppress the fingerprints and photographs is denied.

¶ 12 We review that ruling for a clear abuse of discretion, *State v. Acinelli,* 191 Ariz. 66, 69, 952 P.2d 304, 307 (App.1997), and will reverse "only for clear and manifest error ... [as to] questions of fact; the applicable standard of review on questions of law is 'de novo.' " *In re Maricopa County Juvenile Action No. JT30243,* 186 Ariz. 213, 216, 920 P.2d 779, 782 (App.1996) (citations omitted). *See also State v. Spreitz,* 190 Ariz. 129, 144, 945 P.2d 1260, 1275 (1997). As he did below, Navarro contends his valid investigative detention at the scene became an illegal arrest when Godoy took him to the police station for questioning, requiring suppression of all photographs, fingerprints, and identification evidence obtained thereafter as fruit of an illegal arrest. Although "[w]e give great deference to the trial court's factual determination, ... we review *de novo* the ultimate question whether an illegal arrest occurred." *State v. Solano,* 187 Ariz. 512, 516, 930 P.2d 1315, 1319 (App.1996).

¶ 13 The trial court found that Navarro was neither in custody nor under arrest when he voluntarily agreed to participate in the investigation by accompanying Godoy to the station for an interview and then consenting to have his picture and fingerprints taken. Navarro does not challenge the trial court's factual findings but argues that his agreement to accompany Godoy did not signify "voluntary consent, but rather[,] acceptance of an unavoidable course of conduct," citing *State v. Winegar,* 147 Ariz. 440, 447, 711 P.2d 579, 586 (1985). Navarro further contends any consent to his transportation, questioning, fingerprints, and photograph

taking was vitiated by Godoy's failure to tell him he was not under arrest or was free to leave. According to Navarro, his transportation to the police station, as the defendant's in *Winegar*, was not voluntary and, therefore, constituted an illegal arrest, requiring suppression of all evidence obtained as a result. We disagree.

¶ 14 In *Winegar*, the defendant contended that her confession, obtained after four hours of questioning, had resulted from an illegal arrest and should have been suppressed at trial. *Id.* at 442, 711 P.2d at 581. Our supreme court agreed and overturned her conviction. *Id.* at 450, 711 P.2d at 589. In that case, the defendant was walking along a city street when four armed officers in uniform and two detectives in plain clothes approached her and her male companion, Tittle, and encircled them. *Id.* at 443, 711 P.2d at 582. One detective identified himself and ordered the defendant and Tittle "to keep their hands away from their body and not to move." *Id.* As the officers did a pat-down search of Tittle and found a weapon, an officer ordered the defendant to step away from Title and a detective stood next to her. *Id.* The detectives told the two they wanted to talk with them "away from the street." *Id.* As our supreme court stated, "[t]he two then accompanied the deputies to … City Hall across the street," without specifically noting whether the police had actually asked the defendant if she was willing to accompany them or whether she had responded to any such request or had simply followed.[4] *Id.*

¶ 15 After the defendant accompanied the officers to city hall, she submitted to a pat-down search and consented to accompany them to a sheriff's office several miles away, where she eventually confessed. The defendant was "kept under constant supervision" at all times while she was with the officers. *Id.* at 448, 711 P.2d at 587. For example, an officer "stood in constant guard at the door of the interview room" and "accompanied defendant to the restroom the several times defendant went there." *Id.* at 443, 711 P.2d at 582. The state conceded that the officers had lacked probable cause to arrest the de-

fendant at the time they initially stopped her on the street. *Id.* at 444, 711 P.2d at 583.

¶ 16 The *Winegar* court determined that, although the initial stop was a seizure for Fourth Amendment purposes, it was constitutional under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). 147 Ariz. at 445–46, 711 P.2d at 584–85. But the court concluded that "the initially valid *Terry* stop became an illegal arrest when the defendant was moved from the street to the City Hall." *Id.* at 446, 711 P.2d at 585. Because the police did not have probable cause to arrest the defendant, the court ruled they should have briefly searched and questioned her on the street. *Id.* If no probable cause to arrest arose from that encounter, the police should have released the defendant so as not to exceed the limits of the brief, investigative detention allowed under *Terry*. *Id.* at 447, 711 P.2d at 586. Therefore, the court concluded that removing the defendant from the place of the investigative encounter "abrogated" the *Terry* stop and resulted in an illegal arrest. *Id.*

¶ 17 Although the operative facts in *Winegar* and this case are somewhat similar, several distinguishable facts here support the trial court's finding that Navarro voluntarily consented to accompany Godoy to the police station and to being photographed and fingerprinted there. Navarro voluntarily arrived at the scene of the investigation. Police, all of whom were in plain clothes, did not confront and surround him on a public street. Navarro concedes his brief handcuffing was part of a valid *Terry* stop. In addition, Godoy removed the handcuffs almost immediately and asked if Navarro was willing to accompany him to the police station for questioning. Navarro presented no evidence contradicting Godoy's testimony that he had verbally agreed to do so. Godoy did not frisk Navarro for weapons before having him sit in the front seat of an unmarked police car. After he arrived at the station, Navarro was allowed to leave the interrogation room unaccompanied to use the restroom and was left alone while Godoy made a telephone call and

---

4. The court later characterized this interaction, however, as defendant's having been "asked."

147 Ariz. at 447–48, 711 P.2d at 586–87.

bought Navarro a soft drink. Navarro agreed to answer questions only after hearing and waiving his *Miranda* rights. At the conclusion of his interview, Navarro agreed verbally and in writing to having photographs and his fingerprints taken because he thought no one would identify him as the shooter. Navarro then voluntarily left the station with another officer to verify his presence at another location after the shooting, which he had believed would be for his own benefit. In sum, the "coercive circumstances" present in *Winegar* are absent here. *Id.* at 447, 711 P.2d at 586.

¶ 18 As the *Winegar* court stated: "[L]aw enforcement authorities can transform *Terry* stops into purely voluntary encounters between citizens and police officers," noting that, " '[w]hen an officer is justified in stopping a suspect for questioning, the stop does not become an arrest if, in the absence of protest or coercion, the officer directs the person to an interview room for questioning.' " *Id.* at 447, 711 P.2d at 586, *quoting United States v. Huberts*, 637 F.2d 630, 636 (9th Cir.1980). *See also State v. Clemons*, 27 Ariz.App. 193, 196, 552 P.2d 1208, 1211 (1976) ("The voluntary accompaniment of an officer from the place of their first encounter to a police station or some other place for further investigation cannot, without more, be considered an arrest."). The course of conduct between Navarro and Godoy meets those criteria of a voluntary encounter rather than constituting the type of " 'extended' *Terry* stop" that violates the Fourth Amendment's probable cause requirement. *Winegar*, 147 Ariz. at 447, 711 P.2d at 586.

¶ 19 Although not cited by the parties, *Solano* also is distinguishable. In that case, Division One of this court concluded that a valid investigative detention at the scene of an altercation had evolved into an unlawful, de facto arrest without probable cause and tainted the suspect's subsequent statement to a police officer about an unrelated, prior shooting. There, officers "decided to transport" the suspect from the scene of the altercation to the scene of the prior shooting, where he made a statement to the transport-

ing officer and then "remained handcuffed in [that officer's] police car for 20 to 30 minutes until the detective interviewed him." *Solano*, 187 Ariz. at 515, 930 P.2d at 1318. Unlike this case, the facts in *Solano* do not reflect that the suspect voluntarily accompanied the officers to the shooting scene or voluntarily cooperated with them in connection with that unrelated incident. In addition, "[t]he record [was] silent regarding any legitimate law enforcement purposes furthered by moving Solano to the shooting scene." *Id.* at 517, 930 P.2d at 1320. Here, in contrast, Navarro voluntarily participated in the investigation, which was moved to the police station for legitimate reasons and with his consent.

¶ 20 Whether an arrest has occurred for Fourth Amendment purposes "turns upon an evaluation of all the surrounding circumstances to determine whether a reasonable person, innocent of any crime, would reasonably believe that he was being arrested." *Winegar*, 147 Ariz. at 448, 711 P.2d at 587. Under the circumstances, a reasonable, innocent person would have felt free to decline Godoy's request to accompany him for questioning downtown. Although Navarro was not told he could decline Godoy's request, we cannot fairly characterize his consent as involuntary or as "acceptance of an unavoidable course of conduct." *Id.* at 447, 711 P.2d at 586. Moreover, Navarro's consent to being photographed and fingerprinted arose not as a result of any alleged illegal arrest, but rather, because he thought it might help exonerate him.[5] *Cf. State v. Miller*, 186 Ariz. 314, 321, 921 P.2d 1151, 1158 (1996) (defendant "decided to talk, not because the police illegally transported him to the police station, but because he thought he might be able to escape criminal liability").

¶ 21 Because we agree with the trial court that Navarro voluntarily consented to accompany Godoy to the police station for questioning, and because we find a reasonable person would have believed he or she was free to decline the request or leave the station at any time, we conclude that Navarro was not under arrest or in custody and that

---

5. Godoy testified that, when he had asked Navarro whether he thought he might be identified as the shooter through the photographs Godoy wished to take, Navarro had said, "I didn't do the shooting, so, I'm pretty sure I'm not going to get identified."

he voluntarily consented to the photographs. Therefore, we do not reach the issue of whether the photographs were the fruit of an illegal arrest. *See State v. Blackmore,* 186 Ariz. 630, 634, 925 P.2d 1347, 1352 (1996). The trial court did not clearly err in denying Navarro's motion to suppress. *See Spreitz,* 190 Ariz. at 144, 945 P.2d at 1275 (no illegal detention when "interrogation and detention were noncoercive," "defendant's interaction with police was entirely cooperative," and "length of detention seem[ed] ... no more than ... necessary to accomplish a reasonable investigation"). Finally, contrary to Navarro's assertion, because he voluntarily permitted the police to photograph and fingerprint him for identification purposes, A.R.S. § 13–3905 is inapplicable and did not require Godoy to seek a court order to detain Navarro to obtain identification evidence.

## II. Constitutionality of A.R.S. § 13–604(I)

¶ 22 Navarro received a 10.5–year prison sentence for attempted second-degree murder, the presumptive term for a nonrepetitive, dangerous, class two felony under § 13–604(I). In imposing the presumptive term, the trial court found that "[a]ny mitigating factor[s] suggested by the Defense are offset in the Court's mind by the fact that this was a totally unprovoked assault on the victim and by the fact that the victim was shot six times." Navarro argues that the sentencing range provided in § 13–604(I), as applied to defendants such as he convicted of attempted second-degree murder, is an "arbitrary violation of 14th Amendment equal protection,"[6] because the same sentencing range applies to defendants convicted of attempted first-degree murder.

¶ 23 We first note that "[d]efining crimes and fixing penalties are legislative, not judicial, functions." *State v. Wagstaff,* 164 Ariz. 485, 490, 794 P.2d 118, 123 (1990). Our legislature has classified both attempted first-degree murder and attempted second-degree murder as class two felonies, punishable under § 13–604(I) when the requisite circumstances exist. *See* A.R.S. §§ 13–604(I),

13–1001(C)(1), 13–1104(B), and 13–1105(C). Navarro's argument, therefore, distills to a claim that the legislature violated the Equal Protection Clause by prescribing the same sentencing range for two different crimes in § 13–604(I).

¶ 24 We review the constitutionality of a statute de novo. *Little v. All Phoenix South Community Mental Health Ctr., Inc.,* 186 Ariz. 97, 101, 919 P.2d 1368, 1372 (App.1995). Although a sentence imposed within statutory limits may be attacked as unconstitutional on equal protection grounds, *State v. Renteria,* 126 Ariz. 591, 593, 617 P.2d 543, 545 (App.1979), we presume a statute is constitutional unless the challenging party establishes beyond a reasonable doubt that it is unconstitutional. *Duarte v. State ex rel. Lewis,* 193 Ariz. 167, ¶ 4, 971 P.2d 214, ¶ 4 (App.1998). Navarro has not done so here.

¶ 25 The Fourteenth Amendment's Equal Protection Clause "generally require[s] that all persons subject to state legislation shall be treated alike under similar circumstances." *Crerand v. State,* 176 Ariz. 149, 151, 859 P.2d 772, 774 (App.1993). However, "the Equal Protection Clause ... does not require that all persons be treated alike, only that individuals within a certain class be treated equally and that there exist reasonable grounds for the classification." *In re Maricopa County Juvenile Action No. J–72804,* 18 Ariz.App. 560, 565, 504 P.2d 501, 506 (1972). "We [will] uphold legislation not involving a suspect classification or fundamental right when it is rationally related to a legitimate government purpose." *Wigglesworth v. Mauldin,* 195 Ariz. 432, ¶ 19, 990 P.2d 26, ¶ 19 (App.1999). As one sentenced pursuant to a statutory scheme, Navarro is not a member of a suspect class. *See id.* at ¶ 21; *see also State v. Nguyen,* 185 Ariz. 151, 153, 912 P.2d 1380, 1382 (App.1996). Moreover, Navarro does not contend that application of § 13–604(I) to him violates any fundamental right. Therefore, we apply the

6. Navarro also contends his sentence under § 13–604(I) "constitute[d] cruel and unusual punishment under the 8th Amendment of the U.S. Constitution." In his reply brief, however,

Navarro admits he "may have waived" this argument by failing to raise it below. We agree. *State v. Bolton,* 182 Ariz. 290, 297, 896 P.2d 830, 837 (1995).

rational basis test. *Duarte*, 193 Ariz. 167, ¶ 5, 971 P.2d 214, ¶ 5.

¶ 26 We agree with the state that the legislature has authority to determine that all attempts to take human life may be punished equally, regardless of the underlying mens rea relating to the attempt. We also note that the range of punishment under § 13–604(I) from mitigated to aggravated terms takes into account factual variations between cases. Hypothetically, conviction of attempted first-degree murder could involve the premeditated use or threatening exhibition of a deadly weapon, yet result in no physical injury to the intended victim. On the other hand, conviction of attempted second-degree murder could involve the use of a weapon to inflict six gunshot wounds resulting in permanent disfigurement and disability, as it did in this case. Either scenario provides a rational basis for assigning the same range of punishment for different crimes.

¶ 27 "There is no denial of equal protection if there exists a rational basis for differentiated punishment," *State v. Canaday*, 141 Ariz. 31, 37, 684 P.2d 912, 918 (App.1984), or, by the same token, a rational basis for imposing the same punishment for different crimes. Although the sentencing court may consider differing factual scenarios in determining aggravating or mitigating factors under A.R.S. §§ 13–604(I) and 13–702, we cannot say the legislature lacked a rational basis in establishing the same sentencing range for class two felonies, including but not limited to attempted first- and second-degree murder, that involved "discharge, use or threatening exhibition of a deadly weapon or dangerous instrument or ... the intentional or knowing infliction of serious physical injury upon another." § 13–604(I). Because the legislature has the sole power to prescribe punishment for criminal acts, *State v. Scott*, 186 Ariz. 503, 506, 924 P.2d 507, 510 (App. 1996), and because we find no violation of Navarro's equal protection rights, the trial court did not unconstitutionally sentence Navarro under § 13–604(I).

**DISPOSITION**

¶ 28 Navarro's convictions and sentences are affirmed.

BRAMMER, Presiding Judge, and FLÓREZ, Judge, concurring.