170 P.3d 667

The STATE of Arizona, Appellee,

v.

Lemon Montrea JOHNSON, Appellant.

No. 2 CA–CR 2006–0079.

Court of Appeals of Arizona,
Division 2, Department B.

Sept. 10, 2007.

Review Denied Nov. 29, 2007.

Terry Goddard, Arizona Attorney General By Randall M. Howe and Joseph L. Parkhurst, Tucson, Attorneys for Appellee.

Robert J. Hooker, Pima County Public Defender By M. Edith Cunningham, Tucson, Attorneys for Appellant.

*OPINION*

BRAMMER, Judge.

¶1 After a jury trial, appellant Lemon Johnson was convicted of unlawful possession of a weapon as a prohibited possessor and possession of marijuana. After finding he had two prior felony convictions, the trial court sentenced him to concurrent, mitigated and presumptive terms of imprisonment of eight years and one year. Johnson contends the trial court erred in denying his motion to suppress, in giving a reasonable doubt instruction mandated by our supreme court in *State v. Portillo*, 182 Ariz. 592, 898 P.2d 970 (1995), and in finding he has prior convictions without a jury trial. We reverse.

### Factual and Procedural Background

¶2 When reviewing the denial of a motion to suppress, "we consider only the evidence presented at the suppression hearing and view that evidence and reasonable inferences therefrom in the light most favorable to upholding the court's ruling." *State v. May*, 210 Ariz. 452, ¶4, 112 P.3d 39, 41 (App.2005). Oro Valley Police Officer Maria Trevizo, on assignment with the state gang task force, was on patrol in Tucson with two other officers at approximately 9 p.m. on April 19, 2002. The officers were in an area in which "[d]irectly to the west ... [is] a neighborhood known as Sugar Hill ... that is a gang-related area." Trevizo testified Sugar Hill is associated with the Crips gang, and members of that gang wear blue apparel. Trevizo also noted that "gang members will often, in general, possess firearms."

¶3 An officer in Trevizo's vehicle "r[a]n the license plate of a vehicle" and found it had a "mandatory insurance suspension." [1] Trevizo and the other officers in the vehicle "were not investigating gang activity as part of the traffic stop" and were not "targeting [the vehicle] for [their] gang task force function." They also "[did not] know where [the car had] been ... [and did not] know where

---

1. Trevizo stated a mandatory insurance suspension occurs when "the Motor Vehicle[] Department has suspended the registration ... for an insurance-related purpose.... Sometimes people will get a ticket for [not having] insurance and not pay it, or sometimes they've been cited multi-ple times for not having insurance. There's different reasons." According to Trevizo, it "is a ticketable offense" and "[a] civil citation" but does not "bring concern with regard to criminal activity."

it [was] going." The officers had seen no behavior in the vehicle "indicative of criminal activity."

¶ 4 Johnson was sitting in the rear of the vehicle, with the driver and another passenger in the front seats. Trevizo stated she had no "reason to believe that [Johnson] was engaged in criminal activity or about to engage in criminal activity when [she] made the traffic stop." Johnson "looked back [at the officers], said something to the people in the front, and then continued to look back at [the officers] while [they] initiated the stop." Trevizo testified this was unusual conduct for an occupant of a vehicle being stopped, and it made her nervous. One officer spoke to the driver and "at some point ... asked everybody to put their hands where he [could] see them." He asked whether any of the men in the car had weapons and all the occupants said no. The officer also had the driver exit the vehicle to get "his basic information: driver's license, registration, insurance."

¶ 5 Trevizo examined Johnson for seven indicia of gang affiliation.[2] Johnson was dressed entirely in blue, and had a blue bandanna. Trevizo testified that bandannas are often used "to show ... allegiance or ... affiliation with a certain gang" and that the only indicator she saw was Johnson's blue clothing. The driver of the car, however, was wearing red clothing.

¶ 6 Trevizo said she was "concern[ed]" because Johnson had "a scanner in his jacket pocket," which people normally do not have "unless they're going to be involved in some kind of criminal activity or going to try to evade police by listening to the scanner." It was the first time Trevizo had seen anyone "carry [a scanner] on their person." According to her, "[t]here's nothing illegal about [having a scanner]," but "it's out of the ordinary." Trevizo did not know whether the scanner was turned on or off.

¶ 7 Trevizo began to talk with Johnson, who was still in the vehicle. He was cooperative and told her his name and date of birth but said he did not have any identification on

him. He said he was from Eloy, and Trevizo testified there is a "predominant gang [there] called the Trekkle Park Crips." Trevizo asked Johnson if he had spent any time in prison, and Johnson responded that "he had done time for burglary and had been out for about a year."

¶ 8 Trevizo testified she "wanted to gather intelligence about the gang [Johnson] might be in" because "gather[ing] intelligence" was one of her "main missions in the task force." She hoped to learn about how big his possible gang was, where it was located, who its leaders were, and "what kind of crimes they're involved in." She sought to isolate him from the other occupants of the vehicle in the hope he would contribute more information. Her "intentions were only to gather gang intelligence and talk to him." The other passenger remained in the vehicle throughout the encounter, talking to the third police officer. According to Trevizo, Johnson "could have refused [to get out of the car], certainly."

¶ 9 Once Johnson left the vehicle in a normal manner, Trevizo "asked him to turn around," and she "patted him down for officer safety because [she] had a lot of information that would lead [her] to believe he might have a weapon on him." Trevizo did not tell Johnson she planned to pat him down before he got out of the vehicle but "made the decision" when he exited the vehicle. It was "the totality of what happened that evening that led [her] to pat him down." She had "not observe[d] anything that appeared to be criminal" at the time of the pat-down search. She stated he could have refused to turn around and put up his hands for the pat-down search. Trevizo felt the butt of a gun near Johnson's waist when she patted him down. Johnson then began to struggle, and she put handcuffs on him.

¶ 10 Johnson was charged with possession of a weapon by a prohibited possessor, possession of marijuana, and resisting arrest. The trial court denied his motion to suppress the evidence found in Trevizo's pat-down

**2.** Trevizo testified the "seven basic ... criteria to determin[e] if somebody is a gang member" are: 1) the colors the person is wearing, 2) tattoos, 3) gang signs, 4) self-proclamation of membership, 5) particular jewelry that might be associated with gangs, 6) photographs, and 7) "correspondence between gang members."

search. A jury found Johnson guilty of the first two charges but not guilty of resisting arrest. This appeal followed.

## Discussion

■ ¶ 11 Johnson asserts the trial court erred when it denied his motion to suppress. "We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion if it involves a discretionary issue, but review constitutional issues and purely legal issues de novo." *State v. Moody*, 208 Ariz. 424, ¶ 62, 94 P.3d 1119, 1140 (2004) (citation omitted).

■ ¶ 12 Johnson contends the frisk was unconstitutional because his encounter with Trevizo was consensual. Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), an officer may conduct an investigatory stop if the officer has " 'a reasonable suspicion supported by articulable facts' " that criminal activity may be occurring. *In re Ilono H.*, 210 Ariz. 473, ¶ 4, 113 P.3d 696, 697 (App.2005), *quoting United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). "Then, if the officer 'has reason to believe that the suspect is armed and dangerous,' the officer may conduct a limited search for weapons." *Id., quoting Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). An officer may not, however, conduct a pat-down search during a consensual encounter if the officer lacks reasonable suspicion that criminal activity is occurring, even if the officer has reason to believe a suspect may be armed and dangerous. *Ilono H.*, 210 Ariz. 473, ¶ 11, 113 P.3d at 699.

¶ 13 In *Ilono H.*, two police officers approached a group of five individuals who were sitting under a ramada in a park that was known for drug and gang activity. 210 Ariz. 473, ¶ 2, 113 P.3d at 697. Ilono was wearing red, baggy clothing, and an officer testified such clothing is often worn by gang members who frequently carry weapons. *Id.* One officer conducted a pat-down search and found a bottle of beer hidden under Ilono's clothes. *Id.* Ilono was arrested for underage possession of alcohol, and officers later found cocaine in a further search conducted incident to his arrest. *Id.* This court found

"[t]he state presented no evidence that would support an officer's reasonable suspicion that any of the individuals under the ramada, including Ilono, was engaged in any criminal activity." *Id.* ¶ 5.

¶ 14 However, this finding did not end the inquiry. The state also contended "the officers' actions had not implicated the standards set forth in *Terry* and its progeny because the individuals under the ramada were never detained and were free to leave until the officers developed cause to arrest Ilono." *Id.* ¶ 7. This court rejected that argument, finding "[b]oth Arizona jurisprudence and other persuasive authority suggest that an officer's right to conduct a pat-down search should be predicated on the officer's right to initiate an investigatory stop in the first instance." *Id.* ¶ 12. We stated:

> *Terry* and its Supreme Court progeny addressed the propriety of a pat-down search exclusively in the context of a lawful investigatory stop. We do not read those cases to authorize a pat-down search as part of a mere consensual encounter—even when an officer may have grounds to believe the targets of the encounter are potentially armed and dangerous.

*Id.* ¶ 11 (footnote omitted). We also quoted *United States v. Burton*, 228 F.3d 524, 528 (4th Cir.2000), for the following proposition:

> [A]n officer may encounter citizens and attempt to question them without implicating the Fourth Amendment. But during such police-citizen encounters, an officer is not entitled, without additional justification, to conduct a protective search. To conduct such a protective search, an officer must first have reasonable suspicion supported by articulable facts that criminal activity may be afoot.

210 Ariz. 473, ¶ 12, 113 P.3d at 700 (alteration in *Ilono H.*).

¶ 15 The decision in *Ilono H.* was based on several different rationales. This court found that, because both the United States and Arizona Supreme Courts have found a person is allowed to disregard or flee from a consensual encounter with law enforcement officers, it would be inconsistent with this idea if the "officer possesse[d] the authority

to require the target of the consensual inquiry to submit to a pat-down search." *Id.* ¶ 13. Also, we examined Justice Harlan's concurrence in *Terry*, which stated:

Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence. That right must be more than the liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection.

*Terry*, 392 U.S. at 32–33, 88 S.Ct. at 1885–86 (Harlan, J., concurring), *quoted in Ilono H.*, 210 Ariz. 473, ¶ 14, 113 P.3d at 700.

■ ¶ 16 Both parties here discuss whether Johnson had been seized during the stop. Johnson correctly reasons that if he was not seized and the resulting conversation with Trevizo was consensual, she had no right to pat him down. *See Ilono H.*, 210 Ariz. 473, ¶ 4, 113 P.3d at 697. After oral argument was held in this case, the United States Supreme Court determined, although in a factual context different than presented here, that a passenger is seized when the vehicle in which he or she is riding is lawfully stopped by police. *Brendlin v. California*, —— U.S. ——, 127 S.Ct. 2400, 2410, 168 L.Ed.2d 132 (2007). Therefore, Johnson was seized when the officers stopped the car.

■ ¶ 17 But, Johnson contends that, even had he been seized when the officers stopped the vehicle, that detention had evolved into a consensual encounter before Trevizo patted him down. Typically, courts have found that seizures during traffic stops can evolve into a consensual encounter when officers return the license or registration to a stopped driver, issue the driver a citation or warning, or

tell the driver he or she is free to go. *See United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir.1996) ("A traffic stop may become a consensual encounter if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority."); *United States v. Werking*, 915 F.2d 1404, 1408–09 (10th Cir.1990) (same); *State v. Box*, 205 Ariz. 492, ¶ 22, 73 P.3d 623, 630 (App.2003) (traffic stop became consensual encounter after officer issued warning to driver for speeding).

¶ 18 We have found no case law governing when the seizure of passengers in a vehicle, incident only to a driver's traffic violation, terminates. *See Maryland v. Wilson*, 519 U.S. 408, 415 n. 3, 117 S.Ct. 882, 886 n. 3, 137 L.Ed.2d 41 (1997) (declining to reach this issue). However, common sense suggests that at some point during the encounter the passengers in the vehicle must be free to leave—their fate is not entirely tied to that of the driver. Obviously, if a driver is arrested and taken to the police station, innocent passengers will not also be taken into custody or required to accompany the driver. If the passengers are told they are free to leave and do so, it is clear they are no longer seized; it is equally clear that, if they are being questioned about the reason for the stop, they remain seized. It is less clear when passengers' seizures terminate under factual situations that lie within the extremes of these examples, but we must be guided by reasonableness. *See Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996) ("The 'touchstone of the Fourth Amendment is reasonableness.' Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances."), *quoting Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991).[3]

---

3. In *Knowles v. Iowa*, 525 U.S. 113, 114, 118, 119 S.Ct. 484, 486, 488, 142 L.Ed.2d 492 (1998), where the Court invalidated a complete search of a vehicle after its driver was given a traffic citation, with no passengers present in the vehicle, the Court stated in passing that police officers "may order out of a vehicle both the driver, and any passengers; [and] perform a 'patdown'

of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous." (Citations omitted.) Neither this dicta, nor the holding in *Brendlin*, informs us when a passenger seizure ends, or if and when it can become a new, separate, and unrelated encounter, or whether such an encounter may be consensual.

¶ 19 "A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer. If the individual is free to leave at any time during the encounter, he or she is not seized under the Fourth Amendment." *Hernandez,* 93 F.3d at 1498; *see also United States v. Manjarrez,* 348 F.3d 881, 886 (10th Cir.2003) ("A consensual encounter is a voluntary exchange between the officer and the citizen in which the officer may ask non-coercive questions."). An encounter is not consensual, however, if "in light of all the circumstances, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *State v. Wyman,* 197 Ariz. 10, ¶ 7, 3 P.3d 392, 395 (App.2000), *quoting Michigan v. Chesternut,* 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988). "Whether a person has been seized by police is a mixed question of law and fact." *Id.*

¶ 20 When we examine whether Trevizo's encounter with Johnson evolved into a consensual encounter, we note that Trevizo's interaction with Johnson and her questions to him were wholly unrelated to the purpose of the traffic stop. Trevizo testified that she and her team "were not investigating gang activity as part of the traffic stop," stating she spoke with Johnson solely because she "wanted to gather intelligence about the gang he might be in," "a choice [she] made to further [the] mission of [her] task force."

¶ 21 Had Trevizo wanted to order Johnson out of the car after it had been stopped, she could have done so. *See Wilson,* 519 U.S. at 415, 117 S.Ct. at 886 ("[A]n officer making a traffic stop may order passengers to get out of the car pending completion of the stop."). However, Trevizo did not do so. As we already noted, Trevizo conceded that, as far as she was concerned, Johnson "certainly" "could have refused" her request to get out of the car.

¶ 22 "[T]he subjective intent of the officers is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted." *Chesternut,* 486 U.S. at 576 n. 7, 108 S.Ct. at

1981 n. 7. None of Trevizo's verbal or nonverbal communications with Johnson before the pat down can reasonably be construed to have conveyed to him that his encounter with her was anything other than consensual. *See Wyman,* 197 Ariz. 10, ¶ 8, 3 P.3d at 395 (finding encounter consensual when "officer did not draw his gun or otherwise physically compel a response ... [and] did not demand that appellant ... speak with him; instead, he asked, albeit in a loud, forceful manner") (citation omitted). The interaction between them had been cooperative from the time the vehicle was stopped until Johnson got out of the car and Trevizo patted him down, as Johnson answered Trevizo's questions about his identity, where he was from, and his criminal background. This conclusion is consistent with Trevizo's testimony that the traffic stop was routine and that no one in the vehicle had been suspected of criminal activity when she and the other officers made the stop.

¶ 23 And, most importantly, neither Trevizo nor the other officers ordered all the occupants to get out of the vehicle during the traffic stop for officer safety reasons. Indeed, the front seat passenger remained in the car throughout the encounter. This fact lends further support to the conclusion that Trevizo's questioning of Johnson was wholly unrelated to the stop and constituted a separate, and consensual, encounter.

¶ 24 Arizona case law supports the proposition that a valid *Terry* stop can evolve into a consensual encounter. In *State v. Navarro,* 201 Ariz. 292, 34 P.3d 971 (App.2001), a suspect in a shooting was detained and placed in handcuffs as part of a valid *Terry* stop, *id.* ¶¶ 4, 17, but this court found the encounter became consensual because the defendant had not been "confront[ed] and surround[ed]" at the initial detention, his handcuffs were removed, and he agreed to accompany an officer to the police station to talk about the shooting and traveled with him to do so, unfrisked, in the front seat of the officer's police car. *Id.* ¶ 17.

¶ 25 We find the situation and outcome in *Navarro* instructive here, particularly because in *Navarro* arguably more coercive factors were present. Both cases involve

**64**

valid *Terry* seizures that evolved into consensual encounters between the police and the defendant. Therefore, after examining all facets of the encounter between Trevizo and Johnson, we conclude that Johnson's leaving the car to speak with Trevizo was consensual and part of Trevizo's separate investigation of Johnson's possible gang affiliation, a matter wholly unrelated to the purpose of the traffic stop. A reasonable person in Johnson's position and under these circumstances would have felt he could have remained in the vehicle. *See Wyman,* 197 Ariz. 10, ¶ 7, 3 P.3d at 395.

¶ 26 The state argues that Trevizo had a specific and articulable suspicion that Johnson was armed and dangerous before she patted him down. It points to Johnson's blue clothing, the police scanner in his pocket, his lack of identification, and his status as a convicted felon. The state also notes Johnson looked backward when the vehicle was stopped, the stop took place near a neighborhood populated by Crips, he was from Eloy where the Crips gang was dominant, and Trevizo knew gang members often carried weapons. Assuming, without deciding, that Trevizo had reasonable suspicion that Johnson was armed and dangerous, this fact alone does not "authorize a pat-down search as part of a mere consensual encounter." *Ilono H.,* 210 Ariz. 473, ¶ 11, 113 P.3d at 699; *see also* 4 Wayne R. LaFave, *Search and Seizure* § 9.6(a), at 617 (4th ed. 2004) ("[I]f an officer, lacking the quantum of suspicion required by *Terry* to make a forcible stop, instead conducts a non-seizure field interrogation, he may not frisk the person interrogated upon suspicion he is armed.") (footnotes omitted).

¶ 27 We find that Trevizo's initial lawful seizure of Johnson incident to the traffic stop of the driver evolved into a separate, consensual encounter stemming from an unrelated investigation by Trevizo of Johnson's possible gang affiliation and that, under the circumstances of this case, a reasonable person in

Johnson's position would have felt free to remain in the vehicle. The state has admitted the officers had no reason to believe Johnson was involved in criminal activity when Trevizo searched him.[4] Trevizo's request that Johnson step out of the car to discuss gang activity, and not for officer safety purposes, was part of a consensual encounter. Accordingly, she had no right to pat him down for weapons, even if she had reason to suspect he was armed and dangerous. *See Ilono H.,* 210 Ariz. 473, ¶ 11, 113 P.3d at 699. Accordingly, the trial court erred in denying Johnson's motion to suppress the evidence found. *See Moody,* 208 Ariz. 424, ¶ 62, 94 P.3d at 1140.

■ ¶ 28 In so holding, we agree with many of the observations our dissenting colleague has made. We agree that law enforcement officers, to be entitled to conduct a pat-down search under circumstances suggesting a suspect may be armed and dangerous, need only reasonable cause to believe the suspect may have committed a crime. *See Terry,* 392 U.S. at 30, 88 S.Ct. at 1884; *Ilono H.,* 210 Ariz. 473, ¶ 4, 113 P.3d at 697. We also agree that Johnson was initially detained incident to the officers' stop of the vehicle's driver. *See Brendlin,* —— U.S. at ——, 127 S.Ct. at 2410. We do not, however, reach the broader question contained within the facts of this case, whether officers, in the interests of their own safety, and based solely on the seizure resulting from the initial traffic stop, may routinely pat down passengers whom they suspect of no crime but whom they reasonably suspect might be dangerous. *See Knowles v. Iowa,* 525 U.S. 113, 118, 119 S.Ct. 484, 488, 142 L.Ed.2d 492 (1998) (suggesting in unexplained dicta that officers may do so). Had the officers immediately ordered Johnson out of the vehicle and conducted a pat-down search for the purpose of assuring their safety during the stop of the driver, that question would be presented.

---

4. The question presented by this case is different from the one we answered in *State v. Riley,* 196 Ariz. 40, ¶¶ 14, 16, 992 P.2d 1135, 1140 (App. 1999), where we upheld the pat-down search of a passenger during a traffic stop because the officer reasonably suspected criminal activity that permitted him to expand the scope of the investigation beyond the traffic violation and continue the passenger's detention. As we have already noted, the state has admitted the officers had no reason to believe Johnson was involved in criminal activity.

¶ 29 Rather, we merely hold that, when an officer initiates an investigative encounter with a passenger that was consensual and wholly unconnected to the original purposes of the routine traffic stop of the driver, that officer may not conduct a *Terry* frisk of the passenger without reasonable cause to believe "criminal activity may be afoot." *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884. Under such circumstances, the encounter becomes meaningfully indistinguishable from the scenario we addressed and found to be consensual in *Ilono H.*[5]

### Disposition

¶ 30 We reverse Johnson's convictions and sentences and remand the case for further proceedings consistent with this decision. Accordingly, we do not address the other issues Johnson raises on appeal.

CONCURRING: PETER J. ECKERSTROM, Presiding Judge.

ESPINOSA, Judge, dissenting.

¶ 31 I respectfully dissent because the majority has interpreted the facts of this case in a less than realistic fashion to essentially conclude that an officer reasonably fearing for her safety during a lawful roadside vehicle stop may not ensure her own safety and that of others present by patting down a suspicious passenger for weapons. Although the majority attempts to disclaim responsibility for such a result by stating it does "not reach" that question, that is precisely the issue raised by the facts of this case. I believe the majority's conclusion is not only contrary to settled law, but could have the unintended effect of unnecessarily increasing the already high level of risk faced by law enforcement officers during some vehicle stops.

¶ 32 In *Ilono H.*, 210 Ariz. 473, ¶ 12, 113 P.3d at 700, this court stated "an officer's right to conduct a pat-down search should be predicated on the officer's right to initiate an investigatory stop in the first instance."[6] The majority concedes the stop in this case was lawful. And this court has found the pat-down search of a passenger of a lawfully stopped vehicle constitutional where an officer had a "reasonable concern for his safety." *State v. Riley*, 196 Ariz. 40, ¶ 16, 992 P.2d 1135, 1140 (App.1999) (pat-down search justified after passenger reached for waistband when asked if had weapon); *see also State v. Valle*, 196 Ariz. 324, ¶ 9, 996 P.2d 125, 128 (App.2000) (police officer may lawfully conduct pat-down search when officer justified in believing individual he or she is investigating at close range may be armed and presently dangerous to the officer or others). " 'The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.' " *Valle*, 196 Ariz. 324, ¶ 9, 996 P.2d at 128, *quoting Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

¶ 33 An officer need not have probable cause in order to conduct a *Terry* pat-down search. *Terry*, 392 U.S. at 22, 88 S.Ct. at 1880. If an officer develops a safety concern during a legitimate vehicle stop, further reasonable suspicion of criminal activity is not necessary. *Riley*, 196 Ariz. 40, ¶ 16, 992 P.2d at 1140. Accordingly, a protective search is justified when officers simply possess an articulable reason to fear for their safety. *See Ilono H.*, 210 Ariz. 473, ¶ 10, 113 P.3d at 699.

---

5. To the extent we draw some different legal conclusions from the essentially undisputed facts than does our dissenting colleague, we note that it remains the state's burden to demonstrate that those facts provided a legal basis for the pat-down search, not Johnson's burden to show they did not. *See State v. Sauve*, 112 Ariz. 576, 577, 544 P.2d 1091, 1092 (1976) (where officers conduct search under exception to warrant requirement, it is state's burden to show situation qualifies under exception before evidence admissible at trial); *Rodriguez v. Arellano*, 194 Ariz. 211, ¶ 12, 979 P.2d 539, 543 (App.1999) (same); *see also* Ariz. R.Crim. P. 16.2(b), 16A A.R.S. Presum-

ably the state's theory was that the pat-down search was necessary for officer-safety purposes related to detaining the driver. We simply conclude the underlying facts of the case demonstrate instead that Trevizo conducted the pat-down search as part of a wholly separate consensual encounter based on an investigation unrelated to the purposes of the stop.

6. In *Ilono H.*, the encounter between the juvenile and law enforcement officers was a consensual encounter, not a traffic stop. 210 Ariz. 473, ¶¶ 2, 11, 113 P.3d at 697, 699.

A number of cases lend support to this view. *See e.g., United States v. Kincade,* 379 F.3d 813, 822 (9th Cir.2004) ("[E]ven outside the context of a lawful arrest supported by probable cause, officers are likewise authorized to conduct a warrantless protective pat-down of individuals they encounter in the field so long as their concerns are justified by reasonable suspicion of possible danger."); *United States v. Hernandez–Rivas,* 348 F.3d 595, 599 (7th Cir.2003) (protective pat-down search during valid traffic stop is constitutional when officer believes individual may be armed or constitute present threat).

¶ 34 The majority relies heavily on *Ilono H.,* a case in which officers on foot approached a group of juveniles wearing baggy clothing in colors associated with gangs; the juveniles were simply sitting under a ramada marked with gang graffiti in a park where drug and gang activity were known to occur. 210 Ariz. 473, ¶¶ 2, 5, 113 P.3d at 697–98. Under these circumstances, this court found that the officers had no reasonable suspicion of criminal activity by "Ilono, or any other person in the group," to justify protective searches of the juveniles. *Id.* ¶ 6. And we held the officers could not, during a consensual encounter, lawfully conduct a protective search based on safety concerns alone. *Id.* ¶ 11. The trial court here, however, correctly distinguished *Ilono H.* from this case, noting that unlike the random encounter and arbitrary pat-down search in *Ilono H., see id.* ¶ 2, Trevizo's frisk was preceded by a lawful traffic stop based on founded suspicion. And Trevizo articulated her safety concerns not about the group in general but about Johnson in particular.

¶ 35 The majority acknowledges that Johnson was lawfully "seized" when the vehicle he was in was stopped, but reasons that "at some point during the encounter the passengers in the vehicle must be free to leave." This is undoubtedly true, but that "point" had not yet occurred here. The record establishes the encounter with Johnson took place within minutes of the stop, and the officer's request that he get out of the vehicle and her patting him down took place within mere moments of each other. As the majority correctly quotes from *Wyman,* an encounter is not consensual if "the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" 197 Ariz. 10, ¶ 7, 3 P.3d at 395, *quoting Chesternut,* 486 U.S. at 569, 108 S.Ct. at 1977. Here, it is highly unrealistic to conclude that merely because the officer was courteous and Johnson cooperative, the ongoing and virtually simultaneous chain of events somehow "evolved into a consensual encounter" in the few short moments involved.

¶ 36 In fact, Johnson had been physically stopped and temporarily "seized" by the police, through no choice of his own and against his will, by virtue of the police stop of the vehicle in which he had been riding. *See Brendlin v. California,* —— U.S. ——, ——, 127 S.Ct. 2400, 2406–07, 168 L.Ed.2d 132 (2007); *State v. Gomez,* 198 Ariz. 61, ¶ 6, 6 P.3d 765, 766 (App.2000). After three officers approached the vehicle, all of the occupants were directed to display their hands and the driver to exit the vehicle. Johnson was in no position to "'ignore the police presence and go about his business,'" notwithstanding Trevizo's subjective notion to the contrary upon which the majority relies. *Wyman,* 197 Ariz. 10, ¶ 7, 3 P.3d at 395, *quoting Chesternut,* 486 U.S. at 569, 108 S.Ct. at 1977. While Trevizo was addressing Johnson, her partner, Officer Machado, was investigating the driver of the car. The stop had not terminated and Johnson was still seized as part of the valid traffic stop. *See Gomez,* 198 Ariz. 61, ¶ 6, 6 P.3d at 766; *Riley,* 196 Ariz. 40, ¶ 16, 992 P.2d at 1140. Moreover, although Trevizo stated Johnson could have refused to get out of the car or be patted down, she testified she never told him he did not have to answer her questions or otherwise cooperate with her, and during cross examination did not disagree when counsel asked "in fact, you weren't seeking [Johnson's] permission?"

¶ 37 Under the circumstances, Johnson's cooperation was not consensual as much as mere "acquiescence [which] signified not voluntary consent, but rather acceptance of an unavoidable course of conduct." *State v. Winegar,* 147 Ariz. 440, 447, 711 P.2d 579,

586 (1985). Moreover, this court has relied on the United States Supreme Court's statement that " 'passengers in automobiles have no Fourth Amendment right not to be ordered from their vehicle, once a proper stop is made.' " *State v. Webster*, 170 Ariz. 372, 374, 824 P.2d 768, 770 (App.1991), *quoting Rakas v. Illinois*, 439 U.S. 128, 155 n. 4, 99 S.Ct. 421, 436 n. 4, 58 L.Ed.2d 387 (1978) (Powell, J., concurring). Indeed, the Supreme Court has stated police "may order out of a vehicle both the driver, and any passengers; [and] perform a 'patdown' of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous." *Knowles v. Iowa*, 525 U.S. 113, 118, 119 S.Ct. 484, 488, 142 L.Ed.2d 492 (1998) (citations omitted).[7] Because Trevizo had the authority to order Johnson from the car, did not inform or indicate to Johnson he was free to disregard her request, and the encounter developed far too quickly for any "evolution" into a consensual one, Johnson's cooperation cannot reasonably be considered consensual.[8]

¶ 38 Trevizo also testified about multiple circumstances that had led her to believe a pat-down search of Johnson was appropriate, including Johnson's atypical behavior at the initiation of the stop, his possession of the scanner, his admission to being a convicted felon, and his potentially being a gang member. The majority incorrectly states that only one indicator of gang involvement was present. On the contrary, Trevizo, who had received basic and advanced gang training and been assigned to the gang task force for two years when this encounter occurred, testified that she considered several factors, including Johnson's age, the stop of the car occurring on the border of a known Crip neighborhood, Johnson's wearing a blue bandanna, an indicator of Crip affiliation, his being from Eloy, a known Crips area, and his felon status, all indicia of possible gang association. The trial court cited all of these circumstances, as well as Johnson's lack of identification, in determining "there was a reasonable basis to believe there was a danger, and [the] stop allowed them to go ahead and do the pat down."

¶ 39 Viewing the evidence and totality of the circumstances realistically and in a light favorable to upholding the trial court's determination, *see May*, 210 Ariz. 452, ¶ 4, 112 P.3d at 41, Trevizo was lawfully in Johnson's presence, the encounter was nonconsensual, and the officer had a reasonable basis to consider him dangerous and therefore conduct a brief pat-down of his person. Accordingly, the trial court did not abuse its discretion in denying Johnson's motion to suppress the evidence discovered as a result of that encounter.

---

7. The majority discounts this language in *Knowles* as mere dicta, however, it is well established that dicta of the United States Supreme Court carries great weight and is generally authoritative. *See United States v. Montero–Camargo*, 208 F.3d 1122, 1132 n. 17 (9th Cir.2000); *In re McDonald*, 205 F.3d 606, 612 (3d Cir.2000); *see also Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 495 n. 41 (3d Cir.1992) (Supreme Court dicta should be respected because that court hears relatively few cases and uses dicta to provide guidance to lower courts).

8. *State v. Navarro*, 201 Ariz. 292, 34 P.3d 971 (App.2001), cited by the majority, bears no resemblance to the situation here. The initial contact with Navarro was not a traffic stop but his arrival at the scene of a shooting during the investigation. *Id.* ¶ 5. Navarro willingly accompanied officers to the police station to investigate the shooting; during the trip, he was unhandcuffed in the front seat of the patrol car and had only been visually searched for weapons; and at the station he was left unattended. *Id.* ¶¶ 5–7. Moreover, the events in *Navarro* took place over a lengthy period of time, rather than the first few minutes of an ongoing traffic stop as in this case.