STATE of Wisconsin, Plaintiff-Appellant,

v.

Jamie L. SALONEN, Defendant-Respondent.

Court of Appeals

*No. 2010AP2504–CR. Submitted on briefs August 16, 2011.
—Decided November 9, 2011.*

2011 WI App 157

(Also reported in 808 N.W.2d 162.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *J.B. Van Hollen*, attorney general, *Joseph DeCeco*, district attorney, and *Mary T. Wagner*, assistant district attorney, Sheboygan.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Robert J. Wells* of *Law Office of Robert Wells*, Sheboygan.

Before Brown, C.J., Neubauer, P.J., and Reilly, J.

¶ 1. BROWN, C.J. The trial court in this case granted Jamie L. Salonen's motion to suppress evidence obtained after she asked to leave the scene of a roadside stop of a vehicle in which she was a passenger, which request was denied by police. A passage in *Arizona v. Johnson*, 555 U.S. 323, 333 (2009), explains that a

105

lawful roadside stop "ordinarily" begins when a vehicle is pulled over for a traffic violation and ends when the police no longer have further need to control the scene, at which time the driver and passengers are free to leave. Therefore, the State asserts that Salonen's request to leave—during the stop, but after she had given identification and police found no warrants were outstanding for her—had no basis in law. We reverse, but we reject the theory that the *Johnson* language creates a bright-line rule that police always have the authority to detain passengers for the duration of a roadside stop. Reading *Johnson* as a whole, it leaves the door open for exceptions to the general rule that passengers are reasonably detained for the duration of a stop. Nonetheless, we hold that Salonen's stop was reasonable under the totality of the circumstances.

¶ 2. We will begin with a timeline of events leading to Salonen's arrest. During the afternoon of July 16, 2009, Salonen was one of two passengers in a vehicle pulled over for speeding. An officer approached the car, asked for identification from all of its occupants, and then returned to his squad car a little over two minutes after the stop began. Once back at his squad, the officer used the on-board computer to run records checks on the occupants and to summon a K-9 officer.[1] He did so because he knew that at least two of the parties had been recently involved with illegal drugs.

¶ 3. The K-9 officer arrived at the scene about ten minutes into the stop. Because the driver of the car had provided his name but no license, the K-9 officer assisted the first officer by helping to verify the driver's

---

[1] A K-9 officer is one in charge of a dog trained, at least in part, to aid police in detecting controlled substances.

identity based on tattoos. Around the time she was doing that, a third officer arrived on the scene as backup for the dog sniff.

¶ 4. The backup officer approached the vehicle eleven minutes and fifty seconds into the stop, while the first officer was still working on citations for the driver, but after the vehicle's occupants had been identified. At that point, Salonen told the backup officer that she needed to leave for work and the officer told her she was not free to go. He also told her that he would be able to give her boss an excuse as to why she was late to work.

¶ 5. Thirteen minutes and nineteen seconds into the stop, the K-9 officer approached the car with her dog. The dog sniff was finished fourteen minutes and forty-five seconds into the stop. Sometime during the sniff, the dog indicated drugs in the passenger seat where Salonen had been sitting. Thus, a maximum of two minutes and fifty-five seconds elapsed between the time Salonen asked the police officer to leave the scene and the time when the dog indicated contraband where she had been sitting.

¶ 6. After the sniff, the K-9 officer returned her dog to her squad car and conducted a search of the vehicle, where she found evidence of drug packaging. She then carried out a pat-down search of Salonen and placed her in handcuffs. Salonen was searched further after transport to the Sheboygan Police Department, where an additional baggie containing marijuana was found in Salonen's mouth. She was charged with possession with intent to deliver THC, less than 200 grams, contrary to WIS. STAT. § 961.41(1m) (2009–10).[2]

---

[2] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

¶ 7. Salonen filed a motion to suppress the evidence seized from her.[3] After a three-day motion hearing, the trial court requested briefs from the State and Salonen and then granted Salonen's motion in a thorough written decision. The State appeals, arguing that the motion should have been denied based on *Johnson* and other case law. *See* WIS. STAT. § 974.05(1)(d).

¶ 8. Whether police conduct violated Fourth Amendment protections is a question of constitutional fact. *State v. Arias*, 2008 WI 84, ¶ 11, 311 Wis. 2d 358, 752 N.W.2d 748. We will uphold the trial court's findings of historical fact unless they are clearly erroneous. *See State v. Griffith*, 2000 WI 72, ¶ 23, 236 Wis. 2d 48, 613 N.W.2d 72. Then, we decide whether those facts constitute a violation de novo. *Id.* The facts pertinent to this appeal are not in dispute, so we will focus on the latter question—whether there was a violation.

¶ 9. It is well-settled law that a dog sniff is not a search under either the U.S. or Wisconsin constitutions, *see Arias*, 311 Wis. 2d 358, ¶¶ 14–24, so the dog sniff was not problematic on its own.[4] Therefore, the issue in this case is whether Salonen should have been allowed

---

[3] Salonen also filed a motion to suppress her statements to police, and that motion was granted by the trial court. The State is not appealing that decision, so we do not address it.

[4] Of course, a dog sniff may not be used to extend a stop. *See State v. Arias*, 2008 WI 84, ¶ 41, 311 Wis. 2d 358, 752 N.W.2d 748 ("the relevant inquiry is not whether a dog sniff was conducted, or a question was asked, but whether Arias's detention was unreasonably extended."); *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful

to leave when she asked—before the car was searched and drugs were discovered on her person. Salonen argues that once the police had checked her identification and ensured no outstanding warrants, she should have been free to leave, even though the officer was still working on citations for the driver. The trial court agreed with Salonen, and specifically found that based on the officer's testimony, he would have been finished checking Salonen's identification before she asked to leave. The State, as we explained at the outset, argues that *Johnson* forecloses Salonen's argument and the trial court's decision.

¶ 10. First, we analyze the language in *Johnson* stating generally that Salonen's detention would "ordinarily" be reasonable for the duration of the stop. *See Johnson*, 555 U.S. at 333. In that case, the Supreme Court held that an investigatory stop of drivers and passengers is reasonable "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Id.* at 327. It emphasized that in such cases "[t]he police need not have . . . cause to believe any occupant of the vehicle is involved in criminal activity." *Id.* Then, the *Johnson* court stated broadly:

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. *See Brendlin [v. California*, 551 U.S. 249, 258 (2007)].

seizure, so long as those inquiries do not measurably extend the duration of the stop.") But this is not an issue here.

*Johnson*, 555 U.S. at 333. So, the State is not out-of-bounds to rely on this language in arguing that simply because the officer in this case was not finished issuing citations to the driver when Salonen asked to leave, her detention was reasonable as a matter of law.

¶ 11. But when we read *Johnson* as a whole, we see that the Court referred to the way stops are "normally" and "ordinarily" conducted. *See id.* The position of the lower court in *Johnson* was that "common sense suggests that at some point during the encounter the passengers in the vehicle must be free to leave— their fate is not entirely tied to that of the driver." *State v. Johnson*, 170 P.3d 667, 671 (Ariz. Ct. App. 2007), *rev'd sub nom. Arizona v. Johnson*, 555 U.S. 323 (2009). As LaFave points out, while the Supreme Court did not directly respond to that contention, it did imply that such fine-tuning would not "ordinarily" be necessary when it stated that passenger detentions "ordinarily continue[], and remain[] reasonable, for the duration of the stop." *See* WAYNE R. LAFAVE, 4 SEARCH & SEIZURE § 9.3, Supp. 129 (4th ed.); *Johnson*, 555 U.S. at 333. Again, as La Fave comments, this is recognition that:

> the need for (or at least the possibility of) terminating the passenger's seizure earlier on at least some occasions seems to be within the contemplation of the Court, as reflected in the very last sentence in the *Johnson* opinion: *"Officer Trevizo surely was not constitutionally required to give Johnson an opportunity to depart the scene after he exited the vehicle without first ensuring that, in so doing, she was not permitting a dangerous person to get behind her."*

*See* LAFAVE, 4 SEARCH & SEIZURE § 9.3, Supp. 129 (emphasis added).

¶ 12. It is this last sentence in *Johnson* that tells us how to decide these issues. The reason why passen-

110

gers must normally remain on the scene with the drivers until the stop has concluded is because of officer safety concerns. Public interest in officer safety during traffic stops is great. *See, e.g., Johnson*, 555 U.S. at 331. As the Supreme Court has repeatedly noted, traffic stops are inherently "fraught with danger to police officers." *Id.* at 330 (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1983)). Importantly, the Supreme Court has also noted that the risk of violence during traffic stops "stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop." *See Johnson*, 555 U.S. at 331 (quoting *Maryland v. Wilson*, 519 U.S. 408, 414 (1997)). A passenger's motivation to employ violence "to prevent apprehension of such a crime" is therefore "every bit as great" as that of the driver. *Johnson*, 555 U.S. at 331–32 (quoting *Wilson*, 519 U.S. at 414). The risk of harm to police and occupants of a stopped vehicle is minimized "if the officers routinely exercise unquestioned command of the situation." *Johnson*, 555 U.S. at 330 (citation omitted).

¶ 13. On the other side of the equation is the warrantless intrusion upon a citizen's right to go about freely. *See Griffith*, 236 Wis. 2d 48, ¶ 38. To determine whether the intrusion was unreasonable, we must weigh the public interest served by asking Salonen to remain at the scene against the intrusion that resulted from it. *See id.* (citing *Wilson*, 519 U.S. at 411–12). Our focus is on the "incremental intrusion" that resulted from the subsequent police conduct. *See Griffith*, 236 Wis. 2d 48, ¶ 38 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)). Put simply, has the situation evolved so that officer safety is no longer a reasonable

concern?[5] If so, even a small intrusion may well outweigh the normal police response of freezing the situation until the stop is wholly concluded. If officer safety is still a concern, however, there is a heavy weight on the public interest side of the balancing test.

¶ 14. Applying the balancing test here, we are satisfied that the officer safety component outweighed the minimal intrusion Salonen was subjected to by ordering her to stay on the scene. When Salonen asked to leave, she was speaking with a backup officer who knew only that he was called to the scene to assist a K9 officer in securing the scene for a dog sniff. So, the officer to whom Salonen was speaking knew only that the stop had some relationship to the possibility of illegal drugs being involved. As a matter of common sense, he obviously saw his job as being to keep the scene secure while his colleagues investigated whether evidence of a more serious crime might be uncovered. As such, based on the reasoning in *Johnson* and *Wilson*, the "motivation of a passenger to employ violence to prevent apprehension of such a crime [was] every bit as

---

[5] In posing that question, we do not mean to imply that all intrusions on passengers are reasonable when there is a reasonable concern for officer safety. For example, *Johnson* held that officers must have reasonable suspicion that the *passenger* is armed and dangerous before performing a safety frisk, *see Johnson*, 555 U.S. at 327, and there is no indication in this case that the officer had any such suspicion as to Salonen. But what the officer did here is less intrusive than a safety frisk. The backup officer was merely freezing the situation for safety reasons on a very temporary basis during a lawful roadside stop. The incremental intrusion on Salonen was not any sort of search of her person, but just a general directive to stay where the backup officer could "ensur[e] that . . . [he] was not permitting a dangerous person to get behind [him]." *See id.* at 334.

great as that of the driver." *Johnson,* 555 U.S. at 331–32 (quoting *Wilson,* 519 U.S. at 414)). It would be unreasonable to expect this back-up officer to make the decision that there was no longer a police safety component given the limited information that this officer had. He simply was not in charge of the scene.

¶ 15. And it is not as if the officer's refusal created some monumental intrusion to Salonen. The resulting dog sniff kept Salonen on the scene for a maximum of two minutes and fifty-five seconds more before the dog revealed drugs near her seat in the car. During that time, she was simply told to remain at the scene, without being put in handcuffs or having her liberty restrained in any other way. The officer assured her that if she was late to work, he would be able to get her boss an excuse. So, the intrusion on Salonen was minimal. We are convinced that the stop fell within the parameters of what *Johnson* says is "ordinarily" reasonable. We see no facts in this case that warrant an exception to *Johnson*'s general guideline that the detention of a passenger ordinarily remains reasonable for the duration of the stop. *See Johnson,* 555 U.S. at 333. We therefore reverse the trial court's decision granting Salonen's motion to suppress and remand for further proceedings.

*By the Court.*—Order reversed and cause remanded.